IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

ELDON E. AMICK, Individually and
as Personal Representative of the
Estate of BARBARA E. AMICK,
Deceased,

     Plaintiff,

v.                                    Civil Action No:  2:13-CV-6593

OHIO POWER COMPANY, et al

     Defendants.

## OHIO POWER COMPANY'S MEMORANDUM IN SUPPORT
## OF MOTION TO EXCLUDE

Ohio Power Company ("OPC") offers the following in support of its motion to exclude certain opinions from plaintiff's expert witnesses.

**I.**    **Preliminary Statement:**

OPC respectfully requests this Court exclude under Fed. R. Evid. 702, *Daubert v. Merrell Dow Pharmaceuticals, Inc.*[1] and *Kumho Tire Co., Ltd v. Carmichael*[2] any opinion of plaintiff's expert witnesses that : 1) there is no safe level of exposure or every exposure to asbestos above background level is a substantial contributing factor in the development of mesothelioma; 2) plaintiff Eldon Amick was exposed to asbestos while on the premises of OPC or any opinion as to the level of alleged exposure; 3) plaintiff's decedent Barbara Amick was exposed to asbestos at her home during the time that Eldon Amick worked on the premises of OPC; and 4) any alleged exposure at home of Barbara Amick due to Eldon Amick working on the premises of OPC exceeded background or was a substantial contributing factor or cause of her mesothelioma.

---

[1] 509 U.S. 579 (1993)
[2] 526 U.S. 137 (1999)

As is more fully set forth below, each of these proffered opinions are not supported by sound, scientific reasoning or methodology, are not supported in fact or by adequate validation, and therefore are not reliable as required under applicable law.

## II.   **Statement of Relevant Facts**:

The relevant facts should in large part not be in dispute.  Plaintiff's decedent Barbara Amick unfortunately was diagnosed with and ultimately died from a condition known as mesothelioma.  Plaintiff claims that Mr. Amick's brief work during the new construction of Units 1 and 2 to OPC's Muskingum River Power Plant (Muskingum) in late 1953 to the second quarter 1954 was a substantial contributing factor in Mrs. Amick's development of mesothelioma.  In this regard, Mr. Amick only worked as a bookkeeper/accounting clerk and admittedly did not directly work with or around any asbestos containing product.  Plaintiff claims Mrs. Amick developed mesothelioma due to exposure to asbestos brought to the home by Mr. Amick during this brief work at OPC.

Mr. Amick testified that while at Muskingum he worked in accounts payable. E. Amick Tr. 22.  His job was limited to receiving purchase orders for the ongoing construction and matching them with the receiving report.  E.Amick Tr . 22-24, 103, 137-138, 210, 235. Importantly, he did not work inside the Units being constructed or anywhere near the workers performing the construction.  Instead, Mr. Amick worked in an office environment located in a shack about 200 yards away from the Units being constructed.  E.Amick Tr  24, 65, 72, 233.  Mr. Amick  was not required to walk through the plant to get to his primary work location and only ventured out to the construction site once a week for 2-3 hours to get the receiving reports. E.Amick Tr. 25-26, 78, 80-81, 197, 242.  This brief venture to reconcile reports occurred in the field or outside; Mr. Amick did not go inside the station or Unit.  E. Amick Tr. 80-81, 217, 242. Mr. Amick was never responsible for loading or unloading any of the products or equipment

delivered to the facility and he never personally installed or otherwise worked with any of the products or equipment.  E. Amick Tr. 62, 79, 84-84, 111.

When Mr. Amick started at Muskingum in late 1953, the building was complete and all of the products and equipment was installed for Unit 1. [3] E. Amick Tr. 63-64. Unit 2 was 75% completed when he left OPC's premises in 1954. E.Amick Tr.67-68.  Since Unit 2 went on line in June, 1954, plaintiff would have stopped working at Muskingum well before June, 1954. Plaintiff's experts have failed to consider any evidence as to what construction was actually occurring in the brief months Mr. Amick was on the premises, much less any investigation to determine the use of asbestos products.  As well, Units 1 and 2 would have been enclosed at this time, which information was also not apparently germane to plaintiff's experts when considering the potential exposure to Mr. Amick working in a separate structure from the Units.

Plaintiff's experts can identify no epidemiology or other study of any kind which has ever implicated this extenuated and tenuous path of exposure to asbestos as causing mesothelioma. In fact, there are no studies which relate to air-monitoring for asbestos inside a home for an individual who worked at a power plant. Lemen, Tr. 30.  It is undisputed that the present literature on take home asbestos exposure involves the evaluation of trades which work directly with asbestos and in high exposure settings such as mining, textile and other manufacturing plants which use asbestos and insulators, which is not relevant to the situation in this action.

While the paucity of factual evidence of exposure to asbestos due to work on OPC's premises is glaring, plaintiff's experts also fail to consider the other potential sources of exposure which highlights the speculative, conjecture, and unreliable nature of their opinions in this action.  In this regard, Barbara Amick was 78 years old at the time of her diagnosis of

---

[3] Unit 1 at Muskingum went on line in December, 1953.  In other words construction was complete at the time of plaintiff's arrival.

3

mesothelioma.  From birth and until 1970 she predominately lived in Vienna, West Virginia.[4]  B. Amick  Tr. 3-15, 90   From birth until her marriage to Eldon Amick in June of 1952 she lived with her parents.  Following her marriage to Eldon, except for the couple of years when they resided in Ohio, they resided in Vienna until 1970 when they moved to Florida.  During those approximately thirty five years, Ms. Amick's potential exposure to asbestos included take home exposure from her father,  Auzel Boone, who was employed at the American Viscose plant located in South Parkersburg, West Virginia.  As well, Johns Manville had an asbestos manufacturing plant also located in Vienna, West Virginia and at which Mr. Amick briefly worked.[5]  Although studies exist regarding the increased level of asbestos in the ambient air of a community which surrounds such a facility, and the increase incidence of mesothelioma, plaintiff's experts fail to consider the impact this facility had on the ambient air breathed by Ms. Amick each day for years.[6]

Ms. Amick also participated directly in significant remodeling to her Vienna residence which utilized asbestos products and this was the only other potential asbestos exposure considered by plaintiff's experts.[7]  In that regard, the plaintiff's experts opined that the home remodeling work was a significant source of exposure and cause of her injury.[8]

Mesothelioma is a known consequence of exposure to asbestos, but can also be idiopathic, or having no known cause.  Virtually all experts will concede that the threshold exposure for the induction of mesothelioma is unknown, but that it is a dose response relationship.   Since the 1930s, and to this date, the medical and scientific communities have

---

[4] As is set forth in OPC's Memorandum in Support of Motion for Summary Judgment, the Amicks moved to Ohio during the time Mr. Amick worked at the Muskingum and Kyger Creek Power Plants.
[5] Plaintiff's brother was employed at this facility and also unfortunately succumbed to mesothelioma.
[6] See, M.T. Madkour, M.S. El Bokhary, H.I. Awad Allah, and H.F. Mahmoud,  *Environmental exposure to asbestos and the exposure – response relationship with mesothelioma*, E. Med. Health J., Vol. 15, 1 ( 2009).  Exhibit A.
[7] The remodeling work is discussed in greater detail in OPC's Memorandum in Support Motion for Summary Judgment.
[8] Of course, at the time of rendering those opinions plaintiff was pursuing claims against those entities associated with products at issue in regard to the remodeling.

believed there were safe levels of asbestos exposure.  Over time, the American Conference of

Governmental Industrial Hygienists (ACGIH) and OSHA have promulgated threshold limit

values (TLVs) that "represented the maximum average atmospheric concentration of

contaminants to which workers may be exposed for an 8-hour working day _without injury to_

_health._" (emphasis added)  These TLVs represent conditions "within which it is felt that workers

may be repeatedly exposed, day after day, without adversely affecting their health." [9]  Decades

ago, the original TLV for asbestos was 5 million particles per cubic foot.  Over time, the limit

was successively reduced until 1994 when it fell to 0.1 f/cc; the present-day TLV for asbestos

exposure.  The industrial hygiene community, state and federal governments have determined

this exposure level- and therefore anything below it – will likely not cause disease in any

particular individual. [10]  Threshold mesothelioma causation levels are unknown; a separate issue

is precisely how far above the 0.1 f/cc level an exposure must be to constitute a scientifically

supportable risk.  The TLVs and the lack of any scientific evidence that "every exposure" to

asbestos fibers causes this high dose response related disease underscore the necessity of

knowing the dose before any statement of causation can be proffered.

Plaintiff has designated three experts to offer testimony in this action which relates to

this motion.[11]

**1.     Steven S. Paskal.**[12]

Plaintiff has provided a report authored by Mr. Paskal, an industrial hygienist dated

November 8, 2012. Paskal Report, **Exhibit B.**  Importantly, Mr. Paskal's report is not specific to

---

[9] These quotes are taken directly from the ACGIH definition of a TLV, which is applicable to hundreds of substances and is currently used for industrial hygiene health risk assessments.

[10] The time line of changes in the TLV, inclusive of OSHA's TLV, is discussed in Lemen's deposition, at 72-73

[11] Plaintiff also designated Arnold Brody, PhD and Ronald F. Dodson, MD, PhD but has since advised that she has withdrawn these experts. .  See Plaintiffs' Designation of Expert Witnesses and Disclosure of Initial Expert Reports, **Exhibit C**.

[12] OPC submits that lengthier discussion of the expert's testimony is set forth in its Memorandum in Support of Motion for Summary Judgment.  Due to page constraints and not wanting to be too redundant, OPC includes herein an abbreviated summary.

OPC.  Instead, Mr. Paskal looks at potential laundering exposure of Ms. Amick for the brief period that Mr. Amick worked as an accounts clerk in 1953 to 1955, and the exposure during home remodeling.[13] **Exhibit B**.   Although noting that the home remodeling would likely have resulted in exposure to asbestos as much as 100 times any exposure due to laundering clothes, Mr. Paskal concludes that "each of these exposures would have substantially increased her risk of contracting mesothelioma cancer."  **Exhibit B**.   Curiously, Mr. Paskal admits to having no opinion on whether Mr. Amick was exposed to asbestos while at Muskingum.

To determine whether an individual is actually exposed to asbestos and to what level, Mr. Paskal advised he needs to know the following:  whether asbestos-containing products were used; whether  and how the products were actually being installed, removed or manipulated; the distance an individual is from this work; the frequency of an individual's potential exposure in terms of distance and intensity of exposure; whether or not ventilation was present; whether the work was performed outdoors, the weather; and various other factors.  Paskal Tr, 34-37, 54, 56, 59-63, 95-96, 100, 104.  <u>Mr. Paskal has no information or opinion in this case relating to any of these factors.</u>  Id.

As to whether Mr. Amick was ever exposed to asbestos or brought asbestos home on his clothes, Mr. Paskal not only has no opinion, he admitted "he is useless as a witness" as to what "actually happened".  Paskal Tr. 31.  Mr. Paskal conceded Mr. Amick never worked hands-on or assisted with any asbestos product. Paskal, Tr. 47-49.   Mr. Paskal further testified:

- He could not say that Mr. Amick was exposed to asbestos from any product (Id. at 33-34);
- He has no basis to testify that Mr. Amick brought asbestos on his clothes to his home, rather someone else must testify to that issue (Id. at 40:9-16);

---

[13] Mr. Amick worked at Ohio Valley Electric Company's Kyger Creek Facility during its construction from 1954 to 1955, which plaintiff also contends resulted in exposure which was a substantial contributing factor in causing her mesothelioma.

- He cannot help in any way to answer the question as to whether Mr. Amick had dust on his clothes, or whether asbestos was on Mr. Amick's clothes (Id. at 56:11-18);
- He has no opinion as to whether Mr. Amick worked around any product that contained asbestos (Id. at 99:14-19);
- He has no opinion about whether asbestos adhered to the clothes of Mr. Amick (Id. at 106:10-19);
- He has no opinion as to whether Mr. Amick had any exposure to any product or piece of equipment (Id. at 108:21-109:4); and
- Again, he has no opinion that Mr. Amick ever had asbestos on his clothes (Id. at 110:22-111:11).

Indeed, Mr. Paskal testified on at least 7 occasions at deposition that he has no opinion whether Mr. Amick was exposed to asbestos, and agreed any assertion that Mr. Amick brought asbestos to the home must be hypothesized.  Paskal, Tr. 40.

Mr. Paskal is not aware of any studies related to air monitoring performed 200 yards away from a power station (the location of Mr. Amick's office).  Id. at 46:1-20.  In fact, Mr. Paskal described such air monitoring as "research work" and not even something an industrial hygienist would do, or could do with traditional hygiene tools today.  Id.  Mr. Paskal provided three reasons why one could not perform air monitoring for asbestos 200 yards away from a power station, even using today's technology:  1) an industrial hygienist could not detect levels of asbestos below .1 fibers per cc in the first place; 2) one would not be able to catch enough fibers to even detect in a microscope; and 3) one would catch an amount of "bug wings and other crap" that would obscure any fibers anyways.  Id.

Mr. Paskal is neither aware of any test data with regard to measurements of a bystander to the installation of a gasket nor test data with regard to exposure of a household resident of a bystander to the installation of a gasket.  Id. at 38:20-39:11.  Mr. Paskal is not aware of any test data that has ever measured the adherence of dust, or asbestos, on clothing 200 yards away from any plant.  Id. at 51:18-52:7.  Mr. Paskal is not aware of any data or study that has measured the

asbestos exposure of a spouse while laundering clothes. Id. at 56:19-57:12. Instead, he would need to use "inferential data" to address exposure due to laundering activities. Paskal Tr. 57.

Notwithstanding all of the factual limitations on exposure referenced above, Mr. Paskal still weighed in on exposure but cautiously offered that the best he can do is provide a "ballpark estimate" or a "range" of exposure that Mrs. Amick **might** have been exposed. Id. In other words, the best he could do is guess. Mr. Paskal's guess is that the range of levels of exposure to which Mrs. Amick might have been exposed is .1 to 1 fiber/cc. Id. at 59:2-7. Mr. Paskal cautioned that even his guess was subject to other numerous factors which were unknown to him at the present time which could further impact this range – making the potential exposure significantly less. Id. at 59-63. Mr. Paskal provides this potential range on the basis of one study conducted in 1977, which is factually dissimilar and therefore has no application to this action and can provide no guidance. Id. at 82-83.

That study, authored by Sawyer, involved an evaluation of the potential exposure while laundering clothes used by individuals actually removing asbestos at a building in 1977 at Yale University, not of a bystander not involved in the work. Paskal Tr. 82-84. Mr. Paskal also admitted that the air measurements were not taken at a home or of one person's clothing; rather, the measurements were taken at a laundering facility of all the clothes worn by the individuals involved in the abatement operation. Id. This study found that dust measurements during the laundering of the clothes worn during the abatement operating were only in the .1 to 1 fiber/cc range, below the applicable TLV at the time. Id. at 83. [14]

Ultimately, Mr. Paskal cannot provide any expert opinion as to the level of asbestos to which Mrs. Amick was actually exposed, or its frequency or duration. Id. at 56-59. Instead, he

[14] Mr. Paskal noted that the range he provided - .1 to 1 fiber/cc – is many, many of orders of magnitude less than the 5 million particles per cubic foot recommendation set forth by the ACGIH in the 1940s and in effect in the 1950s. Id. at 66:14-19.

provides a guess at a possible range of exposure by Mrs. Amick which he described as "tenuous;" "plausible;" and "potential." Id. *at* 42, 51, 53.  Ultimately, Mr. Paskal concedes that Mr. Amick's work at Muskingum is a "pretty tenuous connection to her exposure, at least as I understand at this point." Id. at 42.

  **2.**   **John C. Maddox**:

  Plaintiff produced a report authored by Dr. Maddox dated October 31, 2012 and an addendum report authored by Dr. Maddox dated January 17, 2013.  See Maddox Reports, **Exhibit D** and **E**.  Dr. Maddox is a pathologist and diagnosed Mrs. Amick with malignant mesothelioma.  He has opined that "all of [Mrs. Amick's] asbestos exposures that caused inhalation of airborne asbestos in concentrations above normal background levels were a significant contributing factor and factual cause of her mesothelioma."  See **Exhibit D**, at p. 3 Prior to issuing his reports, Dr. Maddox never spoke to or interviewed Mr. or Mrs. Amick or any treating physicians of Mrs. Amick.  Maddox Tr., 45-46.  Dr. Maddox had not reviewed any report authored by any other experts – including the report authored by Dr. Paskal. Id. at 50, 54-55.  However, as a pathologist – not an industrial hygienist-, Dr. Maddox admits that in order to reach any conclusion as to causation he must rely upon an industrial hygienist's opinion as to the amount of exposure to asbestos.  Maddox Tr. 48-49.

  In the absence of any finding of asbestos bodies, asbestosis or any indicia of pathologic or radiographic evidence of asbestos-related injury, Dr. Maddox requires a history of significant occupational, domestic or environmental exposure to attribute asbestos as a cause of any mesothelioma.  Id. at 48:1-12; **Exhibit D**, at p. 3.   Dr. Maddox did not find any indication that Mrs. Amick suffered from any asbestos-related disease; no asbestos bodies in the pathology; no pleural plaques or interstitial lung disease; and no asbestosis.  Id. at 47-48.  Dr. Maddox defined significant exposure as "those exposures that are significantly above normal background

environmental air concentration levels, repetitive, and particularly those that are of higher concentration or longer duration." Id. at 50. Dr. Maddox further defined "significant asbestos exposure" as "not just a brief, slight increase that just barely above normal, but I'm talking about either a sustained increase or a repetitive increase in the air concentration of asbestos." Id. at 51-52. Although Dr. Maddox does not exclude lower dose concentrations, Dr. Maddox believes in a "linear dose/response curve as to the significance or substantial quality of those exposures." Id. at 52:8-11. Incredibly, Dr. Maddox testified that in cases where there is simply a potential exposure but without real knowledge of exposure, he would not consider that to be a significant or a substantial asbestos exposure. Id. at 53:20-23.

Dr. Maddox relies upon Mr. Paskal to ascertain whether Mrs. Amick had a significant asbestos exposure in order for him to attribute any exposure as a cause of Mrs. Amick's mesothelioma. Id. at 68.[15] To be clear, Dr. Maddox says he is not aware of the level of any particular exposure which Mrs. Amick may have had in her lifetime, or whether it exceeded background levels, and relies for this information on Mr. Paskal who admits he must guess at any question of exposure. Maddox Tr., 70. Dr. Maddox's opinion is therefore meaningless.

**3.    Richard A. Lemen**:

Plaintiff produced two "expert reports" authored by Dr. Lemen dated March 14, 2009 and March 16, 2009. See Exhibit F. Neither of the reports were authored for this case; rather, Dr. Lemen testified that he prepared them as a "reference document" to refer to during depositions and trial testimony he generally provides for counsel representing plaintiffs around the country.

---

[15] Dr. Maddox confirms that science does not know whether background levels are causative of mesothelioma, but concludes without any meaningful parameters that he attributes exposures above background as a cause of mesothelioma. Id. at 74-76. To further draw Dr. Maddox's ultimate opinion into doubt, it is important to note that although needing significant levels above background as a fundamental pre-requisite, Dr. Maddox did not consider the background level of asbestos in Vienna, West Virginia where plaintiff's decedent resided for more than thirty years. Although noting he was aware that studies do exist which demonstrate that in communities such as Vienna, where asbestos manufacturing facilities exist, the background levels of asbestos are elevated (as are the incidence of mesothelioma), Dr. Maddox did not consider these studies in forming his opinion. Maddox, 97- 98.

See Lemen Tr.,19. Dr. Lemen is an epidemiologist and was disclosed to testify as an expert in this case as to what was known or should have been known based on his review of the medical and scientific literature related to the potential health hazards related to asbestos. Dr. Lemen offers no opinion as to exposure amounts for Ms. Amick or as to causation. However, he admitted significant facts as to the state of scientific epidemiologic literature in regard to relevant matters which bear on the causation issue.

Dr. Lemen concedes he is aware of no epidemiology study, air- monitoring study, medical study, case report or article that exists regarding take home asbestos exposure from a worker at a power plant. Lemen Tr., 30, 55. There are likewise no studies in existence which address accounting clerks and take home asbestos exposure. Id. There are no studies which monitor the levels of asbestos generated in a home during laundering activities. Id. 57. Dr. Lemen finally offered that he has no opinion on whether Ms. Amick was exposed to asbestos. *Id.*, at 40. Curiously, but seemingly an epidemic in asbestos litigation, although not contained in any signed report, Dr. Lemen was designated by plaintiff that he "may testify that each and every exposure to asbestos is a contributing cause to asbestos-related disease and that plaintiff's decedent's increased risk of cancer was caused and/or contributed to by plaintiff's decedent's exposure to the use of asbestos containing products on the premise of premises owners. " See, **Exhibit C**.

OPC has designated experts in the fields of industrial hygiene and epidemiology who address the fallacy of plaintiff's experts opinions and explain that there is insufficient evidence to support any opinion that Ms. Amick was exposed to asbestos due to her husband's work at OPC, much less at a sufficient dose for any expert to conclude the exposure was a substantial contributing factor to her development of mesothelioma. Mr. Joseph Greene, an industrial

hygiene expert, comments as to a significant component to any assumption of exposure which

plaintiff's experts ignore:

> It was my observation from conducting industrial hygiene exposure studies in industry that the farther you moved away from the source generating an airborne dust, the lower the measured airborne concentration would be. At some distance from the source, you would not be able to measure any difference in airborne concentration versus the background ambient airborne concentration in the workplace before the source had been introduced. This observation was even more pronounced if the workplace was outdoors or had a source(s) of general dilution ventilation indoors.

See, **Exhibit G**. Again, plaintiff Eldon Amick worked in a building 200 yards away from the

construction. Likewise, Dr. Alexander in concluding that Mr. Amick's work at OPC was not a

contributing factor to Ms. Amick's mesothelioma succinctly advised,

> The epidemiologic literature does not show that asbestos exposure is increased from background based on domestic exposure from accounting or bookkeeping occupations. In addition, the epidemiologic literature does not support a claim that domestic exposure from accounting or bookkeeping occupations increases the risk of developing mesothelioma.

**Exhibit H**. With this factual backdrop, OPC submits at application of the law requires the

exclusion of the evidence subject to the motion.

## ARGUMENT

As this Court is well aware, under Fed. R. Evid. 702 and *Daubert v. Merrell Dow*

*Pharms.*, 509 U.S. 579 (1993), this Court is to act as the "gatekeeper" in regard to the

admissibility of evidence which is based on scientific, technical, or other specialized knowledge.

See, *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999). As the United States Supreme Court

explains:

> The Rule, in respect to all such matters, establishes a standard of evidentiary reliability. It requires a valid connection to the pertinent inquiry as a precondition to admissibility. And where such testimony's factual basis, data, principles, methods, or their application are called sufficiently into question, the trial judge must determine whether the testimony has a reliable basis in the knowledge and experience of the relevant discipline.

*Kumho, 525 U.S. 137, HN 4.* To be clear, the trial judge is assigned the responsibility of ensuring that the reasoning and methodology underlying the expert's opinion is reliable. *Zellers v. NexTech Northeast, LLC.*, 533 Fed. Appx. 192, 196 (4th Cir. 2013); c*ert. denied,* 2014 U.S. LEXIS 513. Applying this gatekeeper principle to a toxic tort case requires the plaintiff to meet specific requirements, especially with regard to any opinion on causation.[16] In a toxic tort case, the plaintiff is charged with the burden of proving both general causation and specific causation as to the claimed injuries, which must be done with relevant and reliable expert testimony. *Id* To carry this burden and establish plaintiff's injuries were caused by exposure to a specific substance, plaintiff must demonstrate the levels of exposure that are hazardous to human beings generally as well as plaintiff's **actual** level of exposure. *Id.* As the Fourth Circuit explained:

> In determining whether sufficient evidence of exposure exists, a plaintiff must present evidence that shows more than a "mere possibility" of exposure. "In a long line of decisions in this circuit, we have emphasized that proof of causation must be such as to suggest 'probability' rather than mere 'possibility,' precisely to guard against raw speculation by the fact finder. To meet this evidentiary burden, a plaintiff must demonstrate the amount, duration, intensity, and frequency of exposure.

*White v. Dow Chem. Co.*, 321 Fed. Appx. 266 (4th Cir. 2009)(citations omitted).[17] In regard to asbestos, a plaintiff must prove more than a casual or minimum contact with the product. Instead, to support a reasonable inference of substantial causation, there must be evidence of exposure to a specific product on a regular basis over some extended period of time in proximity to where the plaintiff actually worked. *Lohrmann v. Pittsburgh Corning Corp.*, 782 F.2d 1156, 1162-63 (4th Cir. 1986)

In the end, the expert's testimony must be based on more than subjective belief or unsupported speculation. *Zellers,* 533 Fed. Appx. at 197. Where the expert proffer has a greater

---

[16] OCP has filed a Memorandum in Support of Motion for Summary Judgment which sets forth its position on which State's law applies to this action and the applicable causation standard. Under either State's law, it is OPC's position that it owed no duty to Barbara Amick and as a matter of law plaintiff's claims fail. In an effort to avoid redundancy, OPC refers the Court to its memorandum for a more detailed discussion of the applicable law.
[17] See also, *Tolley v. Acf Indus.*, 575 S.E.2d 158 (W.Va. 2002); *Hagy v. Equitable Prod. C.,* 2012 U.S. Dist. LEXIS 91773 (S.D.Wva. 2012), *aff'd*, 2013 U.S. App. LEXIS 20478.

potential to mislead than to enlighten the evidence is properly excluded.  See, *Bourne v. E.I. Dupont De Nemours & Co.*, 85 Fed. Appx. 964 (4th Cir. 2004), *cert.denied,* 2004 U.S. LEXIS 6233 (citing *Westberry v. Gislaved Gummi AB,* 178 F.3d 257 (4th Cir. 1999)).  Plaintiff's experts fail to satisfy this standard or to otherwise elevate their opinion to anything other than mere possibility.

### A)  Any opinion by Plaintiff's Experts as to Exposure to Mr. and Mrs. Amick and Specific Causation Must Be Excluded As Unreliable

OPC seeks to exclude any opinion which relates to unsubstantiated assumptions and conjecture in regard to exposure by either Mr. Amick or Mrs. Amick to asbestos during 1953-1954 when Mr. Amick worked on the premises of OPC at Muskingum.  This includes any opinion that: 1) plaintiff Eldon Amick was exposed to asbestos while on the premises of OPC or any opinion as to the level of alleged exposure; 2) plaintiff's decedent Barbara Amick was exposed to asbestos at her home during the time Eldon Amick worked on the premises of OPC; and 3) any alleged exposure at home of Barbara Amick due to Eldon Amick working on the premises of OPC was a substantial contributing factor or cause of her mesothelioma.

Any opinions in this regard are nothing more than speculation and unsupported conjecture.  To summarize, Dr. Maddox is proffered to offer these opinions but admits he does not know the actual exposure to either and defers to Mr. Paskal for that information.  Mr. Paskal cannot even render the opinion that either was exposed to asbestos during 1953 – 1954, and states any opinion that Mr. Amick was exposed to asbestos is a hypothesis.  Paskal Tr. 40.

Plaintiff's experts candidly admit they are not aware of any evidence that Mr. Amick ever worked with or around asbestos containing products while on OPC's premises.  Each specifically agrees they cannot render the opinion that Mr. Amick was exposed to asbestos or, if so, the amount of that exposure.  Moreover, plaintiff's experts concede there are no studies which exist that have attempted to evaluate exposure in a setting remotely similar to that at issue here; an

accounting clerk at a construction site and take home exposure to his wife.  There are no air-monitoring studies to provide any guidance or reliable estimation of the amount, duration, intensity, and frequency of exposure to asbestos for either Mr. Amick or Mrs. Amick during his presence at Muskingum.  And, Plaintiff's experts have no facts in this case on which to give any opinion on amount, duration, intensity or frequency – much less any other factors they admit would or could significantly impact any opinion on amount, duration, intensity or frequency.

Indeed, as any condition associated with asbestos is subject to a dose-response requirement, knowing the exposure by Mr. Amick is a prerequisite to having any reliable opinion as to possible take home exposure to Mrs. Amick and therefore causation.  It is not disputed that take home exposure to asbestos is far less than the level of exposure to the actual worker handling the asbestos products.   However, plaintiff's only expert to weigh in on exposure cautiously offered that the best he can do is provide a "ballpark estimate" or a "range" of exposure that Mrs. Amick **might** have been exposed.  Paskal Tr., 57-63.  In other words, the best he could do is guess.  Mr. Paskal's guess is that the range of levels of exposure to which Mrs. Amick might have been exposed is .1 to 1 fiber/cc and even this opinion was subject to other numerous factors which were unknown to him at the present time.  Id. at 59-63.  Mr. Paskal provides this potential range on the basis of one study conducted in 1977 which is inapplicable to the present action.  To be sure, the study was factually dissimilar to the present action and therefore has no relevance and does not satisfy the reliability standard required by *Daubert.*

That study, authored by Sawyer, involved an evaluation of the potential exposure while laundering clothes used by individuals performing abatement at a building in 1977 at Yale University.  Id. at 82:14-18.  Mr. Paskal admitted that the dust measurements during laundering were conducted only of the clothes of the persons that actually removed the asbestos-containing products during abatement – not of any bystander or someone casually walking by the abatement

15

operation.  Id. at 83:22-84:10.  Mr. Paskal also admitted that the air measurements were not taken at a home or of just one person's clothing; rather, the measurements were taken at a laundering facility of all the clothes worn by all of the individuals involved in the abatement operation.  Id.  This study found that dust measurements during the laundering of the clothes worn by those doing the abatement were only in the .1 to 1 fiber/cc range, or in an amount lower than the applicable TLV at the time.  Id. at 83:16-21.

Even with the Sawyer study, Mr. Paskal cannot say whether this "potential take home" amount occurred on one or more occasions as no one can state if , when or how frequently Mr. Amick was exposed to asbestos, if at all.  There has been no evaluation by plaintiff's experts as to the stage of construction at Muskingum while plaintiff was there to attempt to bolster any of their opinions.  For instance, they did not try to determine if asbestos was being used between December, 1953 and June 1954 and, if so, where and in what amounts.   They did not consider whether the Units under construction were enclosed or open; which seemingly is a necessary component to address potential exposure to a worker stationed in a trailer 200 yards away from the Units.  Common sense dictates that if the Units were enclosed at the time, any work with asbestos products would have been performed indoors and far away from plaintiff's work site, thereby impacting any potential exposure.  In rendering their guess as to exposure, Plaintiff's experts also make no mention of the fact that Mr. Amick **never testified to going into the Unit itself during the work day in rendering their opinions**.   There is no evidence of exposure.

Moreover, Dr. Maddox is of the opinion that exposure substantially above background is required to say an exposure is a contributing cause to mesothelioma, however, there is no underlying data to establish the background level in Vienna, West Virginia or whether any exposure by Mrs. Amick substantially exceeded background level for a sufficient duration. Plaintiff's experts have also ignored whether the background level in Vienna itself is higher than

16

normal background levels.  This is true as he ignores other potential sources of exposure to Mrs.

Amick from residing in Vienna, West Virginia which includes any take home exposure

occasioned by living with her father or breathing the ambient air of Vienna.   In regard to the

latter, Vienna has an asbestos manufacturing facility which studies available in the scientific

community suggest will elevate the community's background level of asbestos.[18] See, **Exhibit**

**A**.  To be clear, any opinions to be offered on causation do not meet the requirements of Rule

702, are unreliable and must be excluded.

**B) Any opinion that there is no safe level of exposure or every exposure to asbestos above background level is a substantial contributing factor in the development of mesothelioma should be excluded.**

Dr. Maddox's report essentially concludes with the opinion that all of Mrs. Amick's

exposures that caused inhalation of asbestos in concentrations above normal background levels

were a significant contributing factor and cause of her mesothelioma.[19]  Plaintiff further

designated Mr. Lemen to offer that "each and every exposure to asbestos is a contributing cause

to asbestos related diseases."  These general causation statements are inadmissible as the "each

and every exposure" theory is unsupported in the scientific literature and, indeed, has been

rejected on many occasions by other courts for failing to meet the Daubert criteria. [20]

In *Butler v. Union Carbide Corp.*, the court evaluated Dr. Maddox's proposed theory by

the factors used in determining reliability and concluded the theory failed to satisfy the *Daubert*

*analysis.*[21] 712 S.E. 2d 537 (Ga. 2011), *cert.denied*, *2011 Ga. LEXIS 857*.  In excluding his

opinion, the court noted that Dr. Maddox was the "quintessential expert for hire" and deemed his

---

[18] Mr. Amick testified the Johns Manville facility manufactured asbestos for insulation and asbestos-containing automobile panels.  E. Amick Tr., 19 – 20.
[19] For the reasons set forth in Subpart A, the causation opinion of exposure at Muskingum is inadmissible as being unreliable speculation and conjecture.
[20] For a detailed discussion of the fallacy of the "each and every exposure" theory and opinions of courts which have ruled on the issue, See, Mark A .Behrens and William L. Anderson, *The "Any Exposure" Theory; An Unsound Basis for Asbestos Causation and Expert Testimony,* Sw. U. L. Rev., V. 37, 479 ( 2008) Attached as **Exhibit I**.
[21] The *Daubert* factors are: 1) whether the theory or technique can be tested; 2)whether it has been subjected to peer review; 3)whether the technique has a high known or potential rate of error; and 4) whether the theory has attained general acceptance within the scientific community. See, *Daubert,* 509 U.S. at 593-594.

causation testimony was not the product of reliable principles and methods.  *Id.* at 541.

Likewise, in *Betz v. Pneumo Abex LLC*, the Supreme Court of Pennsylvania engaged in an

exhaustive review of the evidence relating to the proposed opinions of Dr. Maddox and affirmed

their rejection.  44 A.3d 27 (Pa. 2011).  In noting that Dr. Maddox's methodology was "plagued

by unwarranted liberties and logical errors", the Supreme Court explained the net effect of Dr.

Maddox's attempted opinion:

> …the any-exposure opinion is also very significant, in that it obviates the necessity for
> plaintiffs to purse the more conventional route of establishing specific causation (for
> example, by presenting a reasonably complete occupational history and providing some
> reasonable address of potential sources of exposure other than a particular defendant's
> product). …
> \*\*\*
> Dr. Maddox's any-exposure opinion is in irreconcilable conflict with itself.  Simply put,
> one cannot simultaneously maintain that a single fiber among millions is substantially
> causative, while also conceding that a disease is dose responsive.

*Betz*, 44 A.3d at 54, 80.  Probably the simplest explanation of the failure in the methodology and

reasoning came from the lower court, as cited by the Supreme Court of Pennsylvania,

> The fallacy of the "extrapolation down" argument is plainly illustrated by common sense
> and common experience.  Large amounts of alcohol can intoxicate, larger amounts can
> kill; very small amount, however can do neither.  Large amounts of nitroglycerine or
> arsenic can injure, larger amounts can kill; small amounts, however, are medicinal.  Great
> volumes of water may be harmful, greater volumes or an extended absence of water can
> be lethal; moderate amounts of water, however, are healthful.  In short, the **poison is in
> the dose**.
> \*\*\*
> Generally accepted scientific methodology may well establish that certain "high dose"
> asbestos exposure causes, or contributes to, a specific hypothetical plaintiff's disease, but
> the plaintiffs have not proffered any generally accepted methodology to support the
> contention that a single exposure or an otherwise vanishingly small exposure has, in fact,
> in any case, ever caused or contributed to any specific individual's disease…

*Id*.  at 32 (emphasis added).  Dr. Maddox's proffered opinion is further in conflict with itself as

he assumes an undefined background level does not increase a risk, but an incremental elevation

bordering on undetectable is a substantial contributing factor.  There is no scientific support for

this conclusion. See also, Footnote 15.

18

Likewise, this past year in *David Sclafani v. Air and Liquid Systems Corp.*, the United States District Court for the Central District of California granted a motion to preclude plaintiffs' experts from testifying that "every exposure" to asbestos is a substantial contributing factor in causing mesothelioma.[22]   Nearly identical to plaintiff's experts in this case, plaintiffs' experts in *Sclafani* intended to opine "each and every exposure to asbestos that an individual with mesothelioma experienced in excess of a background level contribute to the development of the disease."  See, **Exhibit J**.  In excluding the opinion, the court determined the opinion failed to meet the requirements of the *Daubert* factors which measure reliability and therefore was not relevant or reliable.  See, **Exhibit J**.  The Court further noted that "accepting Dr. Brody's opinion as true would render the "substantial factor" prong of the causation test meaningless." Id. The court explained in this regard that "if 'each and every exposure' is a substantial factor in leading to the development of mesothelioma, then all a plaintiff would have to do is prove 1) that he had mesothelioma; and 2) that he was exposed to asbestos at some time."  Id.[23]

As these cases explain, the scientific literature does not support the proffered opinions. To be clear, the mere proof of exposure to "some" level of asbestos fibers cannot, without more, support a finding of causation.  The purported opinion does not address the dose, duration, and frequency required for causation in a toxic tort setting and, indeed, is simply a general statement utilized by plaintiffs' experts in asbestos litigation to pursue claims against all defendants regardless of product type or exposure potential.  The importance of evidence of dose is highlighted in the present action by the admission of Dr. Maddox that he has no opinion on

---

[22] See the May, 2013 Order from the U.S. District Court of Central California Granting Defendants' Motion in Limine, Docket 253 attached hereto as **Exhibit J, p. 6-7.**

[23] Other courts have likewise refused to accept the each and every exposure theory.  See, *Lindstrom v. A-C Prod. Liab. Trust*, 424 F.3d 488 (6th Cir. 2005); *Bartel v. John Crane, Inc.*, 316 F. Supp. 2d 603 (N.D. Ohio 2004), *aff'd*, 2005 U.S. App. LEXIS 21010 (6th Cir.); *Georgia –Pac. Corp. v. Stephens*, 239 S.W.3d 304 (Tex. App. 2007); *Gregg v. V-J Auto Parts, Co.* , 943 A.2d 216 (Pa. 2007)(Further noting that in a dose response disease the expert witness must provide a reasoned, individualized assessment of a plaintiff's exposure history by comparison of the particular product at issue to the totality of exposure history to establish substantial-factor causation).

exposure and found no evidence of asbestos fibers from the analysis he performed on Ms. Amick's lung tissue. He therefore has no evidence of exposure or dose to support any opinion on causation, whether objective or inferential. Any opinion is therefore speculative.

Plaintiff's proffered opinions are not generally accepted in the scientific literature or community, involve suspect methodology, have not been tested or peer reviewed, and are unreliable. To be clear, with the paucity of underlying factual evidence of exposure in the present action, the purported opinions are nothing more than conjecture extrapolated from unsound and unsupported opinions generally used by these same experts in every asbestos action. This Court should follow the lead of other courts and exclude such evidence in this action or, in the alternative, convene a hearing to entertain evidence to further address the *Daubert analysis.*

Respectfully Submitted:


_____/s/ Jeffrey A. Grove_____
Of Counsel for Ohio Power Company

Jeffrey A. Grove, Esq. (#6065)
GROVE & DELK, PLLC
44 ½ 15th Street
Wheeling, WV 26003
(304) 905-1961
(304) 905-8628 – facsimile

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

ELDON E. AMICK, Individually and
as Personal Representative of the
Estate of BARBARA E. AMICK,
Deceased,

      Plaintiff,

v.                                        Civil Action No:  2:13-CV-6593

OHIO POWER COMPANY, et al

      Defendants.

## CERTIFICATE OF SERVICE

On the 28th day of February, 2014, Counsel for Defendant Ohio Power Company, electronically filed the foregoing **OHIO POWER COMPANY'S MEMORANDUM IN SUPPORT OF MOTION TO EXCLUDE** with the Clerk of Court via the CM/ECF System, which will then send notification of said filing to counsel of record.

                                        _____/s/ Jeffrey A. Grove_____
                                        Of Counsel for Ohio Power Company

Jeffrey A. Grove, Esq. (#6065)
GROVE & DELK, PLLC
44 ½ 15th Street
Wheeling, WV  26003
(304) 905-1961